IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BARBARA MARTIN | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| NANCY A. BERRYHILL,[1] Acting | : | |
| Commissioner of Social Security | : | NO.  15-3664 |

## **REPORT AND RECOMMENDATION**

ELIZABETH T. HEY, U.S.M.J.                                February 21, 2017

This action was brought pursuant to 42 U.S.C. § 405(g) to review the final

decision of the Commissioner of Social Security ("Commissioner" or "Defendant"),

denying the Supplemental Security Income ("SSI") application filed by Barbara Martin

("Plaintiff") under Title XVI of the Social Security Act.  For the reasons that follow, I

conclude that the decision of the Administrative Law Judge ("ALJ") is supported by

substantial evidence and recommend that the Commissioner's decision denying benefits

be affirmed.

---

[1]Nancy A. Berryhill became the Acting Commissioner of Social Security on
January 23, 2017.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Ms.
Berryhill should be substituted for the former Acting Commissioner, Carolyn Colvin, as
the defendant in this action.  No further action need be taken to continue this suit
pursuant to section 205(g) of the Social Security Act.  42 U.S.C. § 405(g).

I.   **PROCEDURAL HISTORY**

Plaintiff protectively applied for SSI on December 5, 2011, alleging an onset date of June 1, 2009.  Tr. at 214-20, 230.[2]  The application was denied initially and Plaintiff requested an administrative hearing before an ALJ.  Id. at 84-88, 96-98.  The hearing took place on December 3, 2013.  Id. at 34-73.[3]  The ALJ issued an unfavorable decision on February 7, 2014.  Id. at 17-29.  On May 4, 2015, the Appeals Council denied Plaintiff's request for review.  Id. at 1-3.  Therefore, the ALJ's February 7, 2014 decision is the final decision of the Commissioner.  20 C.F.R. § 416.1472.

Plaintiff filed her complaint in this action on July 7, 2015, and submitted a Brief and Statement of Issues in Support of Request for Review on November 1, 2015.  Docs. 4 & 9.  Defendant filed a response on December 3, 2015, and Plaintiff filed a Reply on December 12, 2015.  Docs. 11 & 12.  Plaintiff has also moved for oral argument.  Doc. 14.  The Honorable Jeffrey L. Schmehl referred the case to the undersigned for preparation of a Report and Recommendation.  Doc. 13.

II.   **LEGAL STANDARD**

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

---

[2]The record indicates that Plaintiff had previously filed unsuccessful applications in October 2009, August 2010, and April 2011, for which she did not seek administrative hearings.  Tr. at 231.

[3]The ALJ originally convened the hearing on April 16, 2013, but postponed it because the medical record was incomplete.  Tr. at 69-72.

whether there is substantial evidence to support the Commissioner's conclusions that Plaintiff is not disabled and is capable of performing jobs that exist in significant numbers in the national economy.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla."  Zirnsak v. Colvin, 777 F.2d 607, 610 (3d Cir. 2014) (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)).  The court has plenary review of legal issues.  Schaudeck, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process, evaluating:

1. Whether the claimant is currently engaged in substantially gainful activity;

2. If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities;

3. If so, whether, based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;

4. If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and

> 5.  If the claimant cannot perform her past work, then the
> final step is to determine whether there is other work
> in the national economy that the claimant can perform.

See Zirnsak, 777 F.3d at 610; see also 20 C.F.R. § 416.920(a)(4).  Plaintiff bears the

burden of proof at steps one through four, while the burden shifts to the Commissioner at

the fifth step to establish that the claimant is capable of performing other jobs in the local

and national economies, in light of her age, education, work experience, and residual

functional capacity.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

# I.   **FACT RECORD AND THE ALJ'S DECISION**

Plaintiff was born December 10, 1960, and thus was 48 years old on her alleged

disability onset date and 53 at the time of the ALJ's decision.  Tr. at 37, 214, 230.

Plaintiff is five feet, eight inches tall, and weighs approximately 220 pounds.  Id. at 41,

235. She completed eighth grade, and completed most but not all of a general educational

development certification ("GED").  Id. at 37.  Plaintiff lives in a house with her adult

son and a friend.  Id. at 42.  She does not have a driver's license, but relies on her

daughters to provide her transportation.  Id. at 38, 41.

Plaintiff worked as a postal clerk.  Tr. at 37-38.[4]  Plaintiff alleged disability due to

depression, back pain, allergies, fibroids, and hypertension.  Id. at 235.

---

[4]It is not entirely clear when Plaintiff stopped working.  At the hearing, Plaintiff
said she stopped working in 2000, but the ALJ clarified that it was 2004.  Tr. at 37.  The
Work History Report indicates 2001.  Id. at 276.  In the Disability Report, Plaintiff said
she stopped working in May 2005, but listed two jobs.  The postal job ended in 2004, and
then she worked for a cleaning contractor for a year.  Id. at 235.  During a consultative
examination, Plaintiff explained that she had been working "under the table" at a
cleaners.  Id. at 462.  The Vocational Expert ('VE') did not consider the cleaning job in
describing Plaintiff's past work.  Id. at 63.

### A.   **Medical Evidence**

####    1.   Physical

Plaintiff has a history of stable hypertension for which she takes Atenolol and Lisinopril,[5] and is followed by her primary care physicians at Wilson Park Medical Center.  Tr. at 529, 532, 556-70, 580, 582, 584, 588, 592, 597, 598, 600, 602, 606, 614, 616, 618, 619.  On September 17, 2009, Plaintiff reported to the emergency room of Penn Presbyterian Medical Center ("Penn Presbyterian") and was diagnosed with a fracture of her right ankle, and she was treated with a cast and walker.  Id. at 491-95.  When she had the cast removed on November 16, 2009, Plaintiff admitted walking with the cast and denied weakness, numbness, tingling, fever or increased pain.  Id. at 372.  In April 2010, Michael S. Downey, D.P.M., of Ankle and Foot Medical Center, performed ankle surgery on Plaintiff at Penn Presbyterian, specifically an open reduction with internal fixation. Id. at 318, 321-22, 510.  During the surgery, a "non-united fracture fragment" was removed and screws inserted.  Id. at 510.  Plaintiff followed up with Dr. Downey in May and June 2010.  Id. at 514, 515, 518.  Two years after the surgery, Plaintiff returned to the Ankle and Foot Medical Center, complaining of constant pain in the right ankle and asking that the hardware inserted to stabilize the ankle be removed.  Id. at 484.  The record does not document any further surgery.

_____

[5]Atenolol (generic Tenormin) is a beta-blocker used to treat angina and hypertension.  See https://www.drugs.com/search.php?searchterm=atenolol (last visited Jan. 31, 2017).  Lisinopril is an angiotensin converting enzyme inhibitor used to treat hypertension and congestive heart failure.  See https://www.drugs.com/search.php?searchterm=lisinopril (last visited Jan. 31, 2017).

The medical records provided by Wilson Park Medical Center are primarily routine appointments for medicine management or the completion of forms.  Tr. at 529-38, 556-70, 582-619.  During this time, Plaintiff was prescribed Atenolol and Lisinopril for her hypertension, and also Flonase, Zaditor, and Zyrtec.[6]  On September 9, 2013, a mammogram showed "scattered calcifications . . . in the upper outer quadrant" of the left breast, and "a nonspecific solid mass."  Id. at 571.  Biopsy was recommended.  Id.  As of Plaintiff's September 18, 2013 office visit, she had not gone for the biopsy.  Id. at 569.[7]

The record contains three opinions regarding Plaintiff's physical limitations.  On April 2, 2012, Candelaria Legaspi, M.D., considered the evidence available at the initial consideration stage of the administrative process and concluded that Plaintiff had no severe impairments.  Tr. at 79.

Hanna Fitch, C.R.N.P., completed a Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities on April 15, 2013.  Tr. at 551-52.

---

[6]Flonase is a nasal spray containing fluticasone, a corticosteroid used to treat nasal congestion, sneezing, runny nose, and itchy or watery eyes caused by seasonal or year-round allergies.  See https://www.drugs.com/flonase.html (last visited Feb. 17, 2017).  Zaditor (generic ketotifen) is an antihistamine used to treat itching of the eyes cause by allergy to dust, pollen, animals or other allergens.  See https://www.drugs.com/search.php?searchterm=zaditor (last visited Jan. 31, 2017).  Zyrtec (generic cetirizine) is an antihistamine used to treat cold or allergy symptoms such as sneezing, itching, watery eyes, or runny nose.  See https://www.drugs.com/search.php?searchterm=zyrtec (last visited Jan. 31, 2017).

[7]According to mental health treatment notes, on October 18, 2013, Plaintiff reported that she was diagnosed with breast cancer two months prior and was scheduled for surgery the following Tuesday.  Tr. at 633.  At the administrative hearing, Plaintiff testified that she had surgery to remove breast cancer on November 12, 2013, and did not yet know if she would be undergoing any kind of radiation treatment or chemotherapy.  Id. at 39.

Ms. Fitch found that Plaintiff could lift or carry 10 pounds frequently, could stand and walk 1 hour in an 8-hour workday, sit for less than 6 hours, and could only occasionally perform postural activities.  Id.[8]

Raul Yankelevich, M.D., conducted a consultative examination and completed a Medical Source Statement on September 6, 2011.  Tr. at 466-72.  During Dr. Yankelevich's examination, Plaintiff complained of persistent low back pain and difficulty bending over, and reported that prescribed medication controlled the pain.  Id. at 467.  Dr. Yankelevich ordered x-rays of Plaintiff's lumbar spine, which were normal.  "Three views of lumbar including, AP, lateral, and spot lateral view the lumbosacral junction shows the vertebral bodies to be normal in stature and alignment and the disk spaces are normal.  No focal osseous lesions are seen."  Id. at 474.  On examination, the doctor noted that Plaintiff had full range of motion in both her upper and lower extremities and no muscle atrophy.  Id. at 469.  He also found Plaintiff had full range of motion of the spine with no palpable spasm or tenderness.  Id.  Dr. Yankelevich found Plaintiff could lift or carry 10 pounds frequently and had no limitation in her ability to stand, walk, sit, or push/pull foot or hand controls.  Id. at 470.  He also found that Plaintiff could perform postural activities frequently.  Id. at 471.

---

[8]The ALJ remarked that Ms. Fitch's assessment appears to have been completed by Plaintiff because the comments after each section are written in the first person.  Tr. at 27 (citing id. at 551 (e.g., "my pin in my ankle and knees hurt")).  However, like the ALJ, I note that the form bears Ms. Fitch's signature.  Id. at 552.

2.    <u>Mental</u>

In May 2011, Plaintiff began mental health treatment at The Consortium for complaints of persistent sadness, trouble concentrating, insomnia, irritability, limited interest in completing daily activities, fatigue, feelings of hopelessness, and decreased daily functioning.  <u>Tr.</u> at 443.  Kareemah Grossett, M.S., L.S.W., noted the following abnormalities in Plaintiff's mental status examination ("MSE"):  flat affect, poor frustration tolerance, impaired attention span, impaired judgment, partial insight, impairment in remote memory and concentration, and fair reading and writing ability.  <u>Id.</u> at 447-48.  Plaintiff was diagnosed with Major Depressive Disorder ("MDD")[9] and found to have a Global Assessment of Functioning ("GAF") score of 50.[10]  <u>Id.</u> at 448-49.

---

[9]The diagnostic criteria for MDD requires that five or more of the following symptoms be present during the same 2-week period and represent a change from previous functioning:  depressed mood most of the day, nearly every day; markedly diminished interest or pleasure in all, or almost all, activities most of the day, nearly every day; significant weight loss  or weight gain; insomnia or hypersomnia nearly every day; psychomotor agitation or retardation nearly every day; fatigue or loss of energy nearly every day; feelings of worthlessness or excessive or inappropriate guilty nearly every day; diminished ability to think or concentrate or indecisiveness nearly every day; or recurrent thoughts of death.  <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 5th ed. (2013) ("<u>DSM-V</u>") at 160-61.

[10]The GAF score is a measurement of a person's overall psychological, social, and occupational functioning, and is used to assess mental health.  <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 4th ed. Text Revision (2000) ("<u>DSM IV-TR</u>") at 32.  A GAF score of 41 to 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  <u>Id.</u> Although the <u>DSM IV-TR</u> has been replaced by the <u>DSM-V</u>, which eliminated reference to the GAF scale, courts have found GAF scores to constitute medical evidence that is to be considered by the ALJ.  <u>Colon v. Barnhart</u>, 424 F. Supp.2d 805, 812 (E.D. Pa. 2006) (Baylson, J.).

Plaintiff sporadically continued treatment at The Consortium through October 2013. Tr. 435-455 (Progress Notes, MSEs, and Treatment Plans dated 5/17/11, 8/10/11, 8/23/11, 8/24/11), 633-83 (Progress Notes, MSEs, and Treatment Plans dated 6/23/11, 8/28/12, 10/25/12, 5/21/13, 7/3/13, 7/23/13, 7/30/13, 8/19/13, 9/17/13, 9/23/13, 10/18/13). These records indicate that Plaintiff was treated at The Consortium from May through August 2011, had a hiatus in treatment for a year, began treatment again in August 2012 for just a few months, and then resumed treatment in May 2013. Id. In addition to therapy, Plaintiff was prescribed citalopram.[11] Throughout her treatment, Plaintiff's symptoms of depression seemed to vary. See id. at 436 (8/24/11 "[f]eeling tired, withdrawn, less interested in family"), 641 (7/30/13 "seemed a bit depressed"), 642 (7/23/13 "seemed to have an improved mood and better eye contact"), 644 (7/3/13 "presented with moderate depression and congruent mood"), 650 ("mood was normal, her affect was congruent," "displays appropriate levels of attention span/concentration"). At times, her diagnoses included Post Traumatic Stress Disorder ("PTSD")[12] and Dysthymic Disorder.[13] Id. at 440 (PTSD), 635, 673 (Dysthymic Disorder). Her GAF

---

[11]Citalopram (Celexa) is an antidepressant. See https://www.drugs.com/search.php?searchterm=citalopram (last visited Jan. 31, 2017). It appears that Plaintiff was prescribed citalopram on only two occasions August 24, 2011, and October 25, 2012. Tr. at 435, 673.

[12]"The essential feature of [PTSD] is the development of characteristic symptoms following exposure to one or more traumatic events." DSM-V at 274.

[13]"The essential feature of Dysthymic Disorder is a chronically depressed mood that occurs for most of the day more days than not for at least two years." DSM-V at 168.

scores ranged from 50 to 65 throughout the treatment period.[14]  Id. at 449 (50 – 5/17/11),

441, 635 (55 - 8/23/11 & 9/17/13), 647, 666, 673 (60 – 10/25/12, 6/6/13 & 5/21/13), 648,

680, 689 (65 - 9/6/12, 8/28/12 & 9/16/13).

With respect to opinion evidence, Peter Garito, Ph.D., considered the record at the

initial stage of the administrative proceedings and concluded that Plaintiff suffered from

an affective disorder, but that she had only mild restrictions in activities of daily living,

maintaining social functioning, and maintaining concentration, persistence and pace, and

had no repeated episodes of decompensation.  Tr. at 80.  Dr. Garito noted that at the time

of his review on April 2, 2012, Plaintiff was not in any mental health treatment and the

last mental health treatment notes from August 2011, indicated that she had no significant

deficits in mental status.  Although she seemed depressed at that time, she had no other

cognitive issues.  Id.

On October 17, 2013, Michael Feinberg, M.D., one of Plaintiff's treating

psychiatrists at The Consortium,[15] completed a Medical Assessment of Ability to do

---

[14]As previously mentioned, a GAF score of 50 indicates serious symptoms.  A GAF score of 51 to 60 indicates "[m]oderate symtpoms (e.g., flat affect and circumstantial speech, occasional panic attacks)[or] moderate difficulty in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV-TR, at 34.  A GAF score of 61 to 70 indicates "[s]ome mild symptoms (depressed mood and mild insomnia) [or] some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  Id.

[15]Dr. Feinberg completed MSEs and assessments of Plaintiff on October 25, 2012, and September 16, 2013.  Tr. at 670-74, 690.

Work-Related Activities (Mental).[16] Tr. at 684.  In the area of Making Occupational

Adjustments, Dr. Feinberg found that Plaintiff had a good[17] ability in 9 out of the 16

categories and was unlimited in her ability to get along with co-workers-peers.  Id. at 685.

He found she had a fair ability to maintain attention for extended periods of two-hour

segments, maintain regular attendance and be punctual within customary tolerances,

maintain concentration, deal with work stresses, and function independently, and that she

had a poor/none ability to complete a workday and work week without interruptions from

psychologically-based  symptoms and perform at a constant pace without a reasonable

number and length of rest periods.  Id.  Dr. Feinberg's note indicates "[s]he is

intermittently overwhelmed by negative emotions."  Id.  In the area of Making Personal

Adjustments, the doctor found Plaintiff had a good ability to understand, remember and

carry out simple job instructions, and a fair ability to understand, remember and carry out

complex and detailed job instructions.  Id. at 686.  The doctor explained that Plaintiff's

depression and anxiety interfere with her memory.  Id.  Finally, in the area of Making

Personal-Social Adjustments, the doctor found she had a good ability to maintain

personal appearance and relate predictably in social situations, but a fair ability to behave

---

[16]It appears that Plaintiff and her attorney attempted to have staff at The
Consortium complete the assessment in September 2013.  Tr. at 637.  However, the staff
declined at that time because the "staff has only known [the] client for a brief period"
because Plaintiff had only resumed treatment in May.  Id.

[17]The form requires the doctor to rate Plaintiff's ability to perform specific
activities using the following terms:  "Unlimited or Very Good -- Ability to function is
more than satisfactory," "Good -- Ability to function is limited but satisfactory," "Fair --
Ability to function is seriously limited but not precluded," and "Poor -- Ability to
function in this area is precluded."  Tr. at 684.

11

in an emotionally stable manner and demonstrate reliability.  Id. at 686.  He explained that Plaintiff cries without a known cause.  Id. at 687.

Ely Sapol, Ph.D., conducted a consultative examination on August 26, 2011.  Tr. at 461-64.  At that time, Dr. Sapol noted that Plaintiff was able to bathe, dress, and shop independently, and she reported having friends.  Id. at 463.  He found that she presented as depressed, but found her manner and affect were appropriate.  Id.  Her attention span and ability to concentrate were satisfactory.  Id. at 464.  Dr. Sapol diagnosed Plaintiff with Adjustment Disorder with depressed mood,[18] and found that she had a GAF score of 60, indicating moderate symptoms.  On September 10, 2011, Dr. Sapol completed a Medical Source Statement of Ability to do Work Related Activities (Mental).  Id. at 458-60.  Dr. Sapol found Plaintiff had slight restriction in understanding, remembering and carrying out short, simple instructions, and moderate restriction in the following: understand, remember, and carry out detailed instructions; make judgments on simple work-related decisions; interact appropriately with the public, supervisors and coworkers; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a routine work setting.  Id. at 459.

### B.    Hearing Testimony and Other Evidence

Plaintiff explained at the administrative hearing that she can lift only about a quart of milk and cannot stand as long as she had in the past.  Tr. at 38.  She explained that she has pain in her feet and knees, id. at 38-39, and that she continues to have problems with

---

[18]The essential feature of Adjustment Disorder is "[t]he presence of emotional or behavioral symptoms in response to an identifiable stressor."  DSM-V at 287.

her right ankle and cannot stand on it too long because she loses her balance.  Id. at 54-

55.  She has told her doctor about the pain in her knee and lower back, but her doctor had

not made any referrals because the cancer surgery took precedence.  Id. at 55.  When

asked what she does during the day, Plaintiff said she watches television and reads

advertisements/circulars.  Id. at 43.  She does very little cooking, but does clean the

bathroom.  Id.  Plaintiff testified that she has six grandchildren, ranging in age from 7 to

18.  Id. at 39.  At times, she goes to their houses and watches them and tries to cook for

them.  Id. at 40.

When the ALJ asked Plaintiff about returning to her prior job as a mail sorter, she

said that she "would love to go back."  Tr. at 45.  When the ALJ  asked "Could you do

that job five days a week, eight hours a day?" Plaintiff responded, "I think I could."  Id. at

46.  However, when counsel broke down the activities required of her former position,

including lifting and being on her feet a great deal of time, she said she had problems

lifting and could not stand on her feet that long.  Id. at 47.  Plaintiff estimated that she

could stand no more than half an hour.  Id.  The ALJ confronted Plaintiff with the

apparent inconsistencies in her testimony as to her ability to stand, and Plaintiff explained

that some of her postal duties allowed sitting.  Id.

Plaintiff said she sought mental health treatment because she was depressed.  Tr.

at 40.  She sees the psychiatrist once a month and a therapist once a month.  Id.  Plaintiff

testified that she sometimes hears her mother, who died when Plaintiff was a child,

calling her name.  Id. at 42.  When asked what makes her depression so bad that she

cannot "go out and get a job," she said, "I don't feel I can apply myself anymore like I

13

should." Id. at 44.  She believes the depression has gotten worse in the past year or two.

Id. at 49.  She said she cries about three times a day and began crying while testifying and

was unable to explain why.  Id. at 50.

Plaintiff explained that her depression affects her concentration such that she gets

distracted from chores and moves from place to place.  Tr. at 51.  She also forgets

appointments and simple things around the house, including cooking.  Id. at 52.  Socially,

she does not have any hobbies or participate in any clubs.  Id. at 54.  Plaintiff testified

that the friend with whom she lives does many things around the house and her only close

friend is Barbara Freeman, who also testified at the hearing.  Id.

Plaintiff and Ms. Freeman have been friends for 42 years and they see each other

twice a week and talk on the phone daily.  Tr. at 57-58.  From her interactions with

Plaintiff, Ms. Freeman believed that Plaintiff's depression was progressing and was

worse than ever.  Id.  She described Plaintiff as secluded and always crying.  Id. at 58.

Ms. Freeman testified that she makes doctor's appointments for Plaintiff and takes her to

doctor's appointments because she will not go by herself and does not remember things.

Id. at 59-60.  Ms. Freeman also thinks that Plaintiff lacks common sense.  "[S]he just

doesn't think the way she should be thinking as an adult."  Id. at 59.

A VE also testified at the hearing.  Tr. at 63-65.  The VE characterized Plaintiff's

Postal Service job as medium and sometimes heavy, but as Plaintiff described the job at

the hearing, the VE found that it was sedentary.[19]  Id. at 63.  The ALJ asked the VE to

_____

[19]During her testimony, Plaintiff explained that there were positions where people
would sit to "case mail."  Tr. at 47.  Presumably, this is the testimony to which the VE

assume a person of Plaintiff's age, education, and work experience who could perform work without any exertional limitations, but limited to simple, routine, repetitive, low stress work.  The VE said that such a person could perform Plaintiff's past work.  However, when the ALJ included a limitation to light work, the VE said that Postal Service jobs required the ability to perform medium work, eliminating Plaintiff's past work.  Id. at 63.  The VE identified other jobs that such a person could perform other jobs such as cleaner, laundry worker, and inspector.  Id. at 64.  The VE also noted that these jobs are simple, routine, and do not require interaction with anybody, despite the fact that the ALJ did not include such a limitation in the hypothetical.  Id.

The ALJ then asked the VE to consider the limitations noted in Dr. Feinberg's mental assessment.  Tr. at 64.  The VE explained that one area would be work preclusive – the inability to complete a normal workday and work week without interruptions from psychologically based symptoms.[20]

**C.    ALJ'S Opinion**

In the decision dated February 7, 2014, the ALJ found as follows:

> 1.    At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 5, 2011, her application date.  Tr. at 19.

---

was referring when she said that it could be performed as sedentary as Plaintiff described the job.

[20]The transcription did not pick up all of the VE's statement in this regard, but what is transcribed logically refers to Dr. Feinberg's finding that Plaintiff had poor or no ability to complete a normal workday and work week without interruptions from psychologically based symptoms.  Tr. at 64, 685.

2.      At step two, the ALJ found that Plaintiff has the following severe impairments:  post right ankle fracture and surgical repair, and obesity.  Id.

3.      At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Id. at 24.

4.      The ALJ determined that Plaintiff retains the RFC to perform the full range of light work.  Id. at 25.

5.      At step four, the ALJ found that Plaintiff is not capable of performing her past relevant work.  Id. at 28.

6.      At step five, relying on the Medical Vocational Guidelines ("the Grids"),  the ALJ found that, considering Plaintiff's age, education, work experience, and RFC, there are other jobs that exist in significant numbers in the national economy that Plaintiff can perform.  Id. at 28.

Therefore, the ALJ concluded that Plaintiff was not disabled.  Id. at 29.

In her request for review, Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ erred by (1) improperly discounting the opinion of Plaintiff's treating psychiatrist, (2) finding Plaintiff's mental impairments were not severe, (3) improperly relying on the Grids, and (4) erroneously finding that Plaintiff was capable of performing light work.[21] Doc. 9. Defendant argues in response that the ALJ's decision is supported by substantial evidence.  Doc. 11.

---

[21]Plaintiff's claims have been reordered for ease of discussion.

II.     **DISCUSSION**

A.     **Consideration of Psychiatric Assessment**

Plaintiff argues that the ALJ improperly rejected the opinion of Plaintiff's treating psychiatrist, Dr. Feinberg.  As previously mentioned, Dr. Feinberg completed a medical assessment of Plaintiff's mental abilities on October 17, 2013, noting limitations in Plaintiff's abilities to maintain attention for extended periods, maintain regular attendance and be punctual, maintain concentration, deal with work stresses, function independently, understand, remember, and carry out detailed and complex instructions, behave in an emotionally stable manner and demonstrate reliability.  Tr. at 685-86.  In addition, Dr. Feinberg noted that Plaintiff would have a poor ability to complete a normal workday and work week without interruptions from psychologically-based symptoms. Id. at 685.

As a general rule, "treating physicians' reports should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'"  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (quoting Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987)); see also Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, "Policy Interpretation Ruling:  Giving Controlling Weight to Treating Source Medical Opinions" (July 2, 1996) (providing for controlling weight where treating physician opinion is well-supported by medical evidence and not inconsistent with other substantial evidence in the record).  An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's

opinion more or less weight depending upon the extent to which supporting explanations are provided." Plummer, 186 F.3d at 429 (citing Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985)). The opinions of a treating physician are entitled to controlling weight where the physician's opinion on the issues of the nature and severity of a claimant's impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." 20 C.F.R. § 416.927(c)(2).

Here, the ALJ discussed the mental health treatment evidence at length before addressing Dr. Feinberg's assessment. He noted that Plaintiff began treatment in May 2011, and at that time her MSE showed that "she was appropriate in appearance, alert, with appropriate behavior, normal speech, appropriate thought content and associations, and normal perceptions, despite an impaired attention span, poor frustration tolerance, and flat affect." Tr. at 20 (citing id. at 448). "She was stable in June." Id. (citing id. at 651). Joshua Blume, M.D., a doctor at The Consortium, "found no abnormalities on [MSE]" on August 24, 2011. Id. at 21 (citing id. at 435).

The ALJ noted the lapse in treatment between August 2011 and August 2012. Tr. at 21. When she returned she had "clear vocational goals she intend[ed] on accomplishing." Id. (citing id. at 682). Her MSE at that time was within normal limits and she was assigned a GAF of 65, indicating only mild impairment. Id. (citing id. at 679-80). In October 2012, she was evaluated by Dr. Feinberg, who noted "[s]he had a 'wonderful appetite' was in a relationship, and laughed easily which Dr. Feinberg felt to

be 'striking in a person who is depressed.'"  Id. (citing id. at 674).  "[MSE] was entirely within normal limits."  Id. (citing id. at 670).

The ALJ noted a second lapse in treatment after the October 2012 evaluation.  Tr. at 21.  Plaintiff returned in May 2013, when her MSE was normal and she had a GAF of 60.  Id. (citing id. at 665-66).  The ALJ summarized the remaining treatment notes: "Despite subjective complaints of depression, her therapist repeatedly note[d] her thought processes, perception, memory and judgment to be intact throughout 2013.  Dr. Feinberg saw her again in September 2013, at which time he gave her a GAF of 65, indicating mild severity."  Id. at 21 (citing id. at 633-44, 689).

The ALJ also reviewed Dr. Sapol's consultative report, noting that he gave only partial weight to Dr. Sapol's finding Plaintiff to have multiple limitations of moderate severity "because his [MSE] findings were within normal limits."  Tr. at 22 (citing id. at 463).

> I give only partial weight to Dr. Sapol's September 2011 opinion, finding [Plaintiff] to have multiple limitations of moderate severity in mental work-related abilities ([tr. at 459]), because his [MSE] findings were within normal limits ([id. at 463]).  [Plaintiff] admitted to a wide range of activities of daily living including caring for her personal needs independently, shopping and socializing with friends, and she was appropriate in manner and affect, open, friendly and cooperative, with satisfactory attention span and ability to concentrate, and ability to perform simple mathematical calculations, with no obvious impairment in memory ([id. at 463]).  He diagnosed adjustment disorder with depressed mood, and like her treating sources, assigned her a GAF of 60 ([id. at 464; see id. at 647, 659, 666, 673]).  I find that Dr. Sapol's narrative report is generally consistent with the evidence, but that the medical source statement he prepared is inconsistent with his own written report.

Id. at 22.  Dr. Sapol's narrative report and MSE support the ALJ's decision.  Specifically, Dr. Sapol found Plaintiff's attention span and ability to concentrate were satisfactory and her fund of information and ability to perform simple mathematical calculations were intact and there was no obvious impairment in recent or remote memory.  Id. at 464.

After this lengthy introduction, the ALJ stated his reasons for not crediting Dr. Feinberg's finding of moderate limitations in Plaintiff's mental work-related abilities.

> As recently as October 2012 he felt she was doing well, had no problem with her returning to work, and set her GAF at 65 indicating only mild impairment ([tr. at 673]).  She had a "wonderful appetite," was in a relationship, and laughed easily ([id. at 674]).  [MSE] was entirely within normal limits ([id. at 670]).  Consistent with a GAF of 60, Dr. Feinberg wrote that "she needs a job," and would "try to return to work" thereby implying that his opinion was that she could sustain work ([id. at 673]).  It appears that he did not see her again until September 2013, at which time he again gave her an even improved GAF of 65 ([id. at 689]).  I find that there is no reason to believe that any decline in [Plaintiff's] mental health functioning lasted or will last for twelve consecutive months with ongoing treatment, because she had an excellent response to her first round of psychotherapy culminating in October 2012 suggesting that her symptoms are amenable to treatment  ([id. at 632-83]), and her GAF score remained consistent at 65 on return to evaluation with Dr. Feinberg in September 2013 ([id. at 689]).  Dr. Feinberg concluded in September 2013 that [Plaintiff] was "much the same as she was a year ago" and was struggling only with obtaining her prescribed citalopram because of quantity limits through her insurance [id. at 690]).  [Plaintiff's] consistent presentation to Dr. Feinberg from October 2012 to her return in September 2013 suggests no ongoing decline in functioning.

Id. at 22.[22]

---

[22]The ALJ's reference to a GAF score of 65 in the October 2012 visit to Dr. Feinberg appears to be a typographical error.  Tr. at 22.  Dr. Feinberg assigned a score of 60 at that time.  Id. at 673.  The ALJ's reference to other results in the same examination

The ALJ then explained that he gave great weight to Dr. Garito's April 2012 opinion, noting that it was well-supported by the record. Tr. at 22.[23] Although Dr. Garito found that Plaintiff suffered from an Affective Disorder, he found only mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. Id. at 80.[24]

After reviewing all of the evidence, I conclude that the ALJ's consideration of Dr. Feinberg's assessment is supported by substantial evidence. Less than three weeks prior to completing the assessment, Dr. Feinberg stated that "[s]he is much the same as she was a year ago," id. at 690, at which time he found Plaintiff had a normal MSE and noted that Plaintiff needs a job. Id. at 673. Indeed, in his September 2013 note, Dr. Feinberg listed as one of Plaintiff's needs that she "complete the Civil Service exam again so she can return to work." Id. at 689. In the intervening year, Myrene Maske, M.S., and Thomas McCluskey, L.S.W., found that Plaintiff's MSEs were within normal limits. Id. at 665-66 (McCluskey – 5/21/13), 658 (Maske – 7/23/13).[25]

_____

as "[c]onsistent with a GAF of 60" illustrates that he was aware of the actual score, as does his reference to an "improved" GAF of 65 in September 2013. Id. at 22.

[23]Dr. Garito conducted his review prior to Dr. Feinberg's assessment. However, the treating notes from The Consortium evidence improvement in Plaintiff's mental status in the intervening time.

[24]The consultative examination referred to in Dr. Garito's report appears to be the August 2011 Medical Source Statement of Dr. Sapol. Tr. at 458-64.

[25]I also note that the ALJ's consideration of the treatment notes as more weighty than a check-the box assessment is consistent with governing caselaw. Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.").

As part of this argument, Plaintiff challenges the ALJ's reliance on GAF scores. Plaintiff complains that the ALJ impermissibly gave determinative weight to the GAF scores, and argues that GAF scores have no "direct correlation to the severity requirements in [the] mental disorders listings." Doc. 9 at 22-23 (quoting 65 Fed. Reg. 50764-50765).

In considering Plaintiff's mental impairment and Dr. Feinberg's assessment, the ALJ addressed the GAF scores in the record.

> As for the GAF scores in the record, since returning to treatment in 2013, [Plaintiff's] GAF scores have ranged from 55 to 65, still indicating only mild to moderate severity ([tr. at 635, 647, 659, 666, 680, 689]). I find that [Plaintiff's] GAF scores present a significantly different picture of her functioning than was painted at the hearing by her and Ms. Freeman's testimony. I am aware that a GAF score is generally viewed as how an individual is functioning at a particular moment in time, and that such an assessment can be highly subjective. In this case, however, many of the GAF scores were agreed to by several mental health professionals who signed the document ([id. at 647, 648]). Moreover, these scores have occurred over a continuum of time, thus showing [a] level of consistency in [Plaintiff's] functioning. I find, therefore, that the GAF scores in this record are valid, consistent, and reasonably reliable, and suggest at most a mild level of limitation caused by mental health symptoms.

Tr. at 21.

As previously mentioned, the GAF scale has been abandoned in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders. However, in response to the publication of the newest edition, the Social Security Administration issued an Administrative Message ("AM") addressing the consideration of GAF scores. Admin. Message 13066, Global Assessment of Functioning (GAF) Evidence in Disability

Adjudication (Soc. Sec. Admin. July 22, 2013).  "Critically, the AM notes that even though the DSM-V eliminated the GAF scale, the SSA 'will continue to receive and consider GAF in medical evidence.'"  Nixon v. Colvin, 190 F. Supp.3d 444, 447 (E.D. Pa. 2016) (Robreno, J.) (quoting AM 13066).  The AM also states that the GAF "is one opinion that we consider with all the evidence about a person's functioning."  Lee v. Colvin, Civ. No. 11-4641, 2014 WL 2586935, at *6 n.3 (E.D. Pa. June 10, 2014) (Dubois, J.).

In this case, I find no error in the ALJ's consideration of GAF scores.  The GAF scores were but one factor that the ALJ considered in assessing Plaintiff's mental health impairment and Dr. Feinberg's assessment.  The ALJ found that the assessment was inconsistent with the treatment notes from The Consortium, including repeated MSE's within normal limits and notations in records.  Tr. at 21-22.  This conclusion is supported by the record.  As previously reviewed, the MSE's are consistently normal, including those performed on August 28, 2012, October 25, 2012,[26] May 21, 2013,  and July 23, 2013.  In addition, in the treatment notes, there are numerous notations undermining the reported limitations in Dr. Feimberg's assessment.  See id. at 660 (response to treatment is "excellent"), 674 ("laughs easily, striking in a person who is depressed" and goal oriented).

Plaintiff also challenges the ALJ's reliance on the GAF scores as "[i]nconsistent and unreliable."  Doc. 9 at 23.  This characterization is wrong.  As the ALJ noted, there

---

[26]This MSE was performed by Dr. Feinberg and in his September 28, 2013 notes, he indicates that "[Plaintiff] is much the same as she was a year ago."  Id. at 690.

were consistent GAF scores from 55 to 65 during  Plaintiff's most recent treatment period at The Consortium.  Tr. at 635 (55 – Sept. 17, 2013), 647 ("60 +/-" – May 21, 2013),  679 (60 – July 23, 2013),  689 (65 – Oct. 17, 2013).[27]   Moreover, as previously discussed, the GAF scores are consistent with the treatment notes including the normal MSEs. Therefore, I conclude that the ALJ's rejection of Dr. Feinberg's assessment is supported by substantial evidence.

### B.   Severity of Mental Impairment / Use of the Grids

Related to the consideration of Dr. Feinberg's assessment, Plaintiff also claims that the ALJ improperly found that her mental impairment was not severe and improperly used the Grids to make his disability determination.  An impairment is severe if it is "of magnitude sufficient to limit significantly the individual's ability to do basic work activities."  Santise v. Schweiker, 676 F.2d 925, 927 (3d Cir. 1982); see also 20 C.F.R. § 416.920(c); SSR 96-3p, 1996 WL 374181, "Considering Allegations of Pain and Other Symptoms in Determining Whether a Medically Determinable Impairment is Severe" (July 2, 1996).  Basic work activities are defined in the regulations as "the abilities and aptitudes necessary to do most jobs," including walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling, or mental activities such as understanding, remembering, and carrying out simple instructions;  use of judgment; responding appropriately to supervision, coworkers and usual work situations; and dealing with changes in a routine work setting.  20 C.F.R. § 416.921(b).  "A severe

---

[27]The prior GAF scores are also consistent and show improvement.  Tr. at 441 (55 – Aug. 23, 2011), 449 (50 – May 17, 2011), 452 (50 – Aug. 10, 2011), 464 (60 – Aug. 26, 2011 – by Dr. Sapol), 648 (65 – Sept. 6, 2012), 673 (60 – Oct. 25, 2012).

impairment is distinguished from a slight abnormality, which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience." Zaccaria v. Comm'r of Soc. Sec., 267 F. App'x. 159, 160 (3d Cir. 2008) (citing Bowen v. Yuckert, 482 U.S. 137, 149-51 (1987)).[28]

Here, the ALJ determined that Plaintiff had only mild limitation in the functional areas of daily living, social functioning, and concentration, persistence and pace. Tr. at 22-23. These conclusions are supported by substantial evidence in the record as cited by the ALJ and the treatment notes discussed at length above including the numerous MSEs that indicate normal attention span, concentration, insight and judgment. In the Function Report Plaintiff completed, she stated that she handles her personal care, makes some of her meals such as sandwiches and soups, and goes to the store once a month. Id. at 244-61, 257-59.[29] Plaintiff's friend, Ms. Freeman, indicated that Plaintiff does housework

---

[28]Ordinarily, an error at the second step of the sequential evaluation is considered harmless if the ALJ proceeds to the latter steps of the evaluation and considers the limitations imposed by all of Plaintiff's medically determinable impairments in formulating the claimant's RFC. See Alvarado v. Colvin, 147 F. Supp.3d 297, 311 (E.D. Pa. 2015) (Stengel, J.) (citing Salles v. Comm'r of Soc. Sec., 229 Fed. App'x 140, 145 n.2 (3d Cir. 2007)); Hankins v. Colvin, Civ. No. 13-4929, 2015 WL 2118770, at *6 (E.D. Pa. May 6, 2015) (O'Neill, J.). That rule, however, would not apply in this case because the ALJ utilized the grids, which do not consider non-exertional limitations, rather than relying on the VE testimony, to make his determination.

[29]Plaintiff completed two Function Reports, and the information in them is not entirely consistent. Tr. at 243-50, 256-63. For example, in one she reported that she can prepare her own meals, and in the other that she cannot prepare her own meals but does prepare sandwiches and soup. Id. at 245, 258. She reported shopping once a month, but also reported that each day she walks to the store. Id. at 244, 246, 259.

and shopping and is able to use public transportation.  Id. at 270.  She is able to handle her own money and checking account.  Id. at 246, 259, 270.

In sum, the mental health treatment evidence in the record supports Dr. Garito's assessment and the ALJ's conclusion that Plaintiff's "[MDD] does not cause more than minimal limitations in her ability to perform basic mental work activities and is therefore nonsevere."  Id. at 20

At the fifth step of the sequential evaluation, the ALJ relied on the Grids in determining that Plaintiff is not disabled.  Tr. at 28-29.[30]  Ordinarily, use of the Grids is precluded when the claimant has nonexertional impairments.  See Grossberg v. Barnhart, No. 04-2397, 2005 WL 703736, at *3 (3d Cir. Mar. 29, 2005) (slip op.) (reliance on Grids prohibited when claimant manifested nonexertional limitations) (citing Sykes v. Apfel, 228 F.3d 259, 273 (3d Cir. 2000)).  However, in this case, Plaintiff's mental health impairment was found not severe.  Specifically, the ALJ found that Plaintiff's depression "does not cause more than minimal limitation in her ability to perform basic mental work activities and is therefore not severe."  Tr. at 20.  In these circumstances, reliance on the Grids is not error.  Williams v. Chater, Civ. No. 95-4056, 1996 WL 755406, at *3 (E.D. Pa. Dec. 31, 1996) ("Since the mental impairment was not severe, there were no non-exertional limitations to affect the use of the grids for the physical impairment."); see also

---

[30]The Grids were promulgated by the Commissioner in order to establish the types and number of jobs that exist in the national economy for claimants with exertional impairments.  See 20 C.F.R. § 416.969.  They consist of a matrix of four factors including physical ability, age, education, and work experience, and provide guidance as to whether a particular combination of all four factors direct a conclusion of "disabled" or "not disabled."  See id.; Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

<u>Acosta v. Barnhart</u>, 114 F. App'x 7, 10 (1st Cir. 2004) (VE testimony not required when mental impairment does not interfere more than marginally with ability to perform work).

As previously discussed, the ALJ's determination that Plaintiff's mental impairment was not severe is supported by substantial evidence in the record.  Therefore, the ALJ did not err in relying on the Grids to determine that Plaintiff was not disabled.[31]

### C.    <u>Light Work</u>

Finally, Plaintiff contends that the ALJ's determination that she can perform light work is not supported by substantial evidence.  Specifically, Plaintiff claims that the ALJ improperly considered the assessments of Nurse Practitioner Fitch and consultative examiner Dr. Yankelvich.  Doc. 9 at 24-28.  Defendant did not specifically address this issue.

As previously discussed, a treating physician's opinion is ordinarily entitled to great weight.  <u>See</u> <u>Plummer</u>, 186 F.3d at 429.  When there is a conflict in the evidence, the ALJ may choose which evidence to credit and which evidence not to credit, so long as he does not "reject evidence for no reason or for the wrong reason."  <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 554 (3d Cir. 2005); <u>Plummer</u>, 196 F.3d at 429; <u>see also</u> 20

---

[31]I note that the VE testified that a person of Plaintiff's age, education, and with her work experience, who was limited to light, simple, routine, repetitive low stress work, requiring no interaction with others, could perform the jobs of cleaner, laundry worker, and inspector.  <u>Tr.</u> at 64.

C.F.R. § 416.927(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").[32]

According to Ms. Fitch's assessment, Plaintiff can frequently lift and carry 10 pounds, occasionally carry 20 pounds, and can stand and walk for 1 hour or less and sit for less than 6 hours in an 8-hour workday. <u>Tr.</u> at 551. The ALJ gave Ms. Fitch's assessment little weight. <u>Id.</u> at 27. Dr. Yankelevich found Plaintiff could frequently lift and carry 10 pounds and had no limitation in standing, walking, or sitting. <u>Id.</u> at 470. The ALJ gave great weight to Dr. Yankelevich's assessment, except as to the level of lifting. <u>Id.</u> at 28.

> [Plaintiff's] nurse practitioner, Hannah Fitch, CRNP (<u>see</u> [<u>id.</u> at 563]), opined that [Plaintiff] is unable to sustain full time work even at the sedentary exertional level ([<u>id.</u> at 551-52]). It appears that this form may have been completed by [Plaintiff] herself, because it is phrased in the first person perspective. Nonethless, the nurse practitioner signed and thereby endorsed [Plaintiff's] stated limitations ([<u>id.</u>]). Dr. Yankelevich found that [Plaintiff] could perform light work but was limited in lifting to 10 pounds, even though his physical examination was almost completely normal ([<u>id.</u> at 466-72]). Plaintiff has had some limited treatment for physical complaints, including post-traumatic arthritis in the right foot and ankle injury ([<u>id.</u> at 301-94, 395-428, 553-631]), and her weight is within the obese range ([<u>id.</u> at 549-50]). However, the record reflects that she had no ankle pain in November 2010, even though the ankle fracture remained non-united at that time ([<u>id.</u> at 301-94]), and more recently in

---

[32]Nurse practitioners are considered "other medical sources," and the Administration will consider evidence from these sources "to show the severity of [a claimant's] impairments and how it affects [a claimant's] ability to work." 20 C.F.R. § 416.913(d); SSR 06-03p, 2006 WL 2329939, "Titles II and XVI: Considering Opinions and Other Evidence from Sources who are not 'acceptable Medical Sources' in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies" (Aug. 9, 2006).

2013 she has had only primary care treatment with minimal complaints regarding her ankle pain and generally normal physical examinations (id. at 553-631). Furthermore, [Plaintiff] participates in activities of daily living such as walking to the corner store for daily needs (id. at 242-52, 253-65), going to the laundromat with her friend helping to carry the laundry ([id. at 266-74]), using public transportation alone ([id. at 242-52, 266-74]), and spending time caring for her grandchildren ([id. at 253-65]). Therefore, I give little weight to the nurse practitioner's opinion that [Plaintiff] cannot sustain full time work at even a sedentary level ([id at 551-52]) as inconsistent with and not well-supported by the record of [Plaintiff's] minimal treatment for physical complaints and wide range of independent activities of daily living. As there is no cervical or upper extremity pain, I see no reason to limit [Plaintiff] to lifting only 10 pounds. Given her minimal treatment for the ankle, and the lack of objective findings, I see no reason she could not lift and carry at the light exertional level, i.e., 20 pounds occasionally and 10 pounds more frequently. Thus, except as to the level of lifting, I give great weight to Dr. Yankelevich's opinion limiting [Plaintiff] to light work ([id . at 466-72]).

Id. at 27-28.

The ALJ adequately explained his reasoning for the weight he gave both assessments. With respect to Ms. Fitch's assessment, the ALJ noted that the limitations were inconsistent with her complaints and treatment. Specifically, Ms. Fitch's assessment states that the medical findings supporting Plaintiff's significant limitations in lifting and carrying are "have problems holding things - hands are weak." Tr. at 551. No such complaint or notation appears in the Wilson Park Medical Center notes. In fact, the treatment notes establish no limitations in Plaintiff's hands. See id. at 556 (Feb. 12, 2013 – no muscle weakness), 569 (Sept. 18, 2013 – "review of systems are negative"). Although there is a notation of joint pain in the April 1, 2013 office notes, id. at 560,

there is no indication that this involved Plaintiff's hands and there is no indication of any such weakness.

In her brief, Plaintiff contends that her limitations in lifting and carrying are caused not by upper body conditions but rather by problems in her lower back and knees, and thus argues that the ALJ rejected the limitations imposed by Ms. Fitch's assessment for the wrong reason. Doc. 9 at 25-26. However, this argument is directly inconsistent with Ms. Fitch's opinion. Ms. Fitch identified the reason for Plaintiff's limitations as "have problems holding things – hands are weak." Tr. at 551. This clearly implies an issue with the upper extremities or cervical spine, areas about which Plaintiff never complained.

With respect to Ms. Fitch's limitations in standing and walking (less than 1 hour), and sitting (less than 6 hours), the treatment notes similarly do not support such significant limitations. Notably, on April 1, 2013, two weeks prior to completing the assessment form, in addressing Plaintiff's ankle, Ms. Fitch noted at Plaintiff's preventative exam that "[s]he has no complaints about pain, decreased [range of motion] or swelling," id. at 559, which undermines the drastic limitations noted on the form. Thus, I conclude that the ALJ properly gave little weight to Ms. Fitch's assessment.

Dr. Yankelevich found Plaintiff could lift and carry 10 pounds frequently. Tr. at 470. He did not check any box to indicate what weight Plaintiff could lift occasionally. He also found Plaintiff had no limitation in sitting, standing, or walking. Id. Plaintiff takes issue with the ALJ's characterization of Dr. Yankelevich's assessment. Doc. 9 at 24. The ALJ said that the assessment was consistent with light work, except for Dr.

Yankelevich's limitation to lifting 10 pounds. Tr. at 27. This is an accurate statement. Moreover, the ALJ explained that Dr. Yankelevich's examination "was almost completely normal." Id. at 27. The doctor noted that the only pain medication Plaintiff took was ibuprofen and noted that the medication controls Plaintiff's musculoskeletal pain. Id. at 467. Plaintiff had full range of motion with both upper and lower extremities, had no swelling, tenderness, redness or deformity of the joint, and no muscle atrophy. Her back and spine had full range of motion. Id. at 469. An x-ray of Plaintiff's lower back requested by Dr. Yankelevich was normal. Id. at 474. Nothing in this examination undermines the ALJ's RFC determination.

In short, although Plaintiff had surgical repair of an ankle fracture, and she complains of lower back and knee pain, the medical records support the ALJ's determination that she is capable of performing light work. Her treatment has been conservative, requiring only ibuprofen to control her complaints of pain. The treatment records show no limitation in the range of motion of her back or lower extremities. The ALJ properly considered the assessments from Ms. Fitch and Dr. Yankelevich.

Subsumed in Plaintiff's claim regarding the level of work she can perform is a challenge to the ALJ's credibility assessment. Plaintiff claims the ALJ made no specific finding about her statements regarding subjective complaints. Doc. 9 at 26. Again, Defendant failed to address this issue.

Social Security Regulations require a two-step evaluation of subjective symptoms: (1) a determination as to whether there is objective evidence of a medically determinable impairment that could reasonably be expected to produce the symptoms alleged; and (2)

an evaluation of the intensity and persistence of the pain or symptoms and the extent to which it affects the individual's ability to work.  20 C.F.R. § 416.929(b).  Similarly, the ALJ is required to consider both the objective evidence of record as well as Plaintiff's subjective testimony.  See SSR 96-7p, 1996 WL 374186, "Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements" (July 2, 1996).[33]   When an individual's alleged symptoms suggest a greater level of severity of impairment than can be supported by the objective medical evidence alone, an ALJ should consider the following factors to assess the credibility of an individual's statements:  (i) the extent of the claimant's daily activities; (ii) the location, duration, frequency, and intensity of the symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication; (v) treatment other than medication for the symptoms; (vi) measures used to relieve pain or other symptoms; and (vii) other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 416.929(c)(3); SSR 96-7.  In addition, an ALJ may consider a claimant's daily activities in assessing credibility.  Inconsistencies in a claimant's testimony or daily activities permit an ALJ to conclude that some or all of the claimant's testimony about her limitations or symptoms is less than fully credible.  See Burns v. Barnhart, 312 F.3d 113, 129-30 (3d Cir. 2002) (playing drums and taking care of four dogs undermined Plaintiff's complaints of disabling pain).

---

[33]Although SSR 96-6p has been superseded by SSR 16-3p, 2016 WL 1237954, I will utilize the SSR in effect at the time of the ALJ's decision.

Here, the ALJ reviewed Plaintiff's claimed symptoms, including those discussed in her Function Reports.  <u>Tr.</u> at 25-26.  He discussed the fact that rain exacerbates her knee pain; ibuprofen relieves her pain; her daily activities include caring for her six grandchildren and doing some cooking for them; she walks to the store each day and manages her own money; despite some complaints of knee pain, she has never been referred to a specialist; she has no current treatment for back, shoulder, or foot pain.  <u>Id.</u> In concluding that Plaintiff could perform the full range of light work, the ALJ specifically stated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  <u>Id.</u> at 25.  I find no error in the ALJ's consideration of Plaintiff's subjective complaints.

## V.    <u>CONCLUSION</u>

The ALJ's decision is supported by substantial evidence.  He properly considered the opinion of Plaintiff's treating psychiatrist, the assessments of nurse practitioner Fitch and consultative examiner Dr. Yankelevich, and Plaintiff's complaints of subjective symptoms.  Because the ALJ properly determined that Plaintiff's mental impairment was not severe, he did not err by relying on the Grids.  Considering the quality of the briefing and after consideration of the record as a whole, I find no need to hold oral argument on the Plaintiff's Request for Review.

Therefore, I make the following:

## R E C O M M E N D A T I O N

AND NOW, this 21st day of February, 2017, it is RESPECTFULLY RECOMMENDED that Commissioner's decision denying Supplemental Security Income be AFFIRMED.  IT IS FURTHER RECOMMENDED that Plaintiff's motion for oral argument be DENIED.  The parties may file objections to this Report and Recommendation.  See Local Civ. Rule 72.1.  Failure to file timely objections may constitute a waiver of any appellate rights.

BY THE COURT:

/s/ELIZABETH T. HEY
_____
ELIZABETH T. HEY, U.S.M.J.